In the Supreme Court of Georgia

Decided: July 5, 2016

S16A0367. STATE OF GEORGIA et al. v. INTERNATIONAL KEYSTONE
KNIGHTS OF THE KU KLUX KLAN, INC.

BLACKWELL, Justice.

This case presents important questions about the doctrine of sovereign immunity and the constitutional guarantee of the freedom of speech. But before we can resolve those questions, we must consider our jurisdiction of this appeal. The case comes to us as an appeal of right. The appeal is taken, however, from a judgment of a superior court reviewing a decision of a state administrative agency, and under OCGA § 5-6-35 (a) (1), there is no appeal of right from such a judgment. An appeal from a judgment of that sort must come instead by way of an application for discretionary review. No application was filed in this case, and that leaves us without jurisdiction. For that reason, the appeal is dismissed.

1. As a part of its efforts to maintain the state highway system,[1] the Georgia Department of Transportation administers the Adopt-A-Highway

_____

[1] See generally OCGA § 32-2-2 (a) (1).

program, which encourages civic-minded Georgians to volunteer to remove litter along state and federal highways throughout Georgia. The Department has promulgated a number of conditions and requirements for those who seek to participate in the program.[2] An organization, business, family, or other group can apply to adopt a particular stretch of highway, and if the Department approves an application, it assigns that stretch of highway to the applicant, the applicant commits to remove litter from the roadside from time to time, and the Department erects a sign along the highway to recognize the applicant. In May 2012, the International Keystone Knights of the Ku Klux Klan applied to participate in the program and sought to adopt a one-mile stretch of State Route 515 in Union County. The Department denied their application.

In June 2012, the Commissioner of Transportation[3] sent a letter to the International Keystone Knights, identifying two reasons for the denial of their application. First, the stretch of State Route 515 from which the International

---

[2] Although these conditions and requirements do not appear in the published Rules and Regulations of the State of Georgia, see OCGA § 50-13-7, they are contained in the record of this case.

[3] The Commissioner is the chief executive officer of the Department. See OCGA § 32-2-40 (a).

Keystone Knights proposed to remove litter is a controlled-access highway with a posted speed limit of 65 miles per hour. The Department had determined for safety reasons, the Commissioner explained, that this stretch of highway was not suitable for adoption by any applicant. Second, alluding to the violent and subversive history of the Ku Klux Klan,[4] the Commissioner said:

> The impact of erecting a sign naming an organization which has a long-rooted history of civil disturbance would cause a significant public concern. Impacts include safety of the traveling public, potential social unrest, driver distraction, or interference with the flow of traffic. These potential impacts are such that were the application granted, the goal of the program, to allow civic-minded organizations to participate in public service for the State of Georgia, would not be met.

Around the same time, the Department suspended the Adopt-A-Highway program, although it has represented that it intends to resume the program at some point.

Three months later, the International Keystone Knights sued the Department in the Superior Court of Fulton County,[5] seeking a writ of

---

[4] See Virginia v. Black, 538 U. S. 343, 352-357 (II) (123 SCt 1536, 155 LE2d 535) (2003) (recounting violent and subversive history of Ku Klux Klan).

[5] The International Keystone Knights named the State of Georgia, the Department, the Commissioner of Transportation in his official capacity, and the Governor in his official capacity as defendants, and all of these defendants are appellants in this Court. For the

3

mandamus, an injunction, and a declaratory judgment, all with the goal of compelling the Department to approve their application. In their complaint, the International Keystone Knights set forth a detailed account of their application and subsequent dealings with various Department personnel, which culminated in the denial of the application. About the first ground for the denial, they alleged that, if the stretch of State Route 515 that they proposed to adopt were unsuitable for safety reasons, they had offered and still were willing to adopt another nearby stretch of the state highway system. As to the second ground, they alleged that the denial of their application on that ground was an abridgement of the freedom of speech as guaranteed by the Georgia Constitution.[6] Among other relief, the International Keystone Knights sought an injunction against the Department "denying [their] Adopt-A-Highway permit"

---

purposes of this opinion, however, it is unnecessary to distinguish among these defendants, and so, to keep it simple, we refer to them collectively as the "Department." In the beginning, the International Keystone Knights also named Union County, the Commissioner of Union County in his official capacity, the North Georgia Resource Management Authority, and the Executive Director of the Authority in her official capacity as defendants. Later, the International Keystone Knights voluntarily dismissed their claims against these latter defendants without prejudice.

[6] See Ga. Const. of 1983, Art. I, Sec. I, Par. V. In their complaint, the International Keystone Knights notably made no mention of the First Amendment of the United States Constitution, which also protects the freedom of speech.

4

and a declaratory judgment that the Department "wrongfully denied [them] an Adopt-A-Highway permit based on the content of [their] speech."

The Department answered the complaint, and it filed a motion to dismiss the lawsuit on several grounds. First, the Department asserted, the doctrine of sovereign immunity barred the claims for declaratory and injunctive relief. Second, the wrong alleged in the complaint, the Department argued, could not properly be remedied by a writ of mandamus, injunction, or declaratory judgment. Third, the International Keystone Knights could have sought judicial review of the denial of their application under the Administrative Procedure Act,[7] the Department said, and for that reason, they had an adequate remedy at law that barred the relief that they sought in the lawsuit.

The trial court agreed that a writ of mandamus would be improper, and it dismissed the mandamus claim. The trial court, however, otherwise denied the motion to dismiss. In its order, the trial court concluded that sovereign immunity was no bar to claims for injunctive and declaratory relief concerning "an alleged illegal restriction on . . . constitutional speech rights." The trial court found that

---

[7] See OCGA § 50-13-1 et seq.

an injunction and declaratory judgment would be appropriate remedies for the wrong alleged in the lawsuit. And about the question of an adequate remedy at law, the trial court concluded that the International Keystone Knights could not have obtained judicial review under the Administrative Procedure Act because the denial of the application did not amount to a "contested case," as that term is used in the Act.[8]

After some discovery, the Department and the International Keystone Knights filed motions for summary judgment. The Department again asserted in its motion that the claims for injunctive and declaratory relief were barred by the doctrine of sovereign immunity. In addition, the Department urged that its denial of the application in this case did not amount to an unconstitutional abridgement of the freedom of speech.[9] The International Keystone Knights, on

---

[8] The Administrative Procedure Act provides for judicial review in "contested cases." See OCGA § 50-13-19 (a). For the purposes of the Act, a "contested case" is "a proceeding, including, but not restricted to, rate making, price fixing, and licensing, in which the legal rights, duties, or privileges of a party are required by law to be determined by an agency after an opportunity for hearing." OCGA § 50-13-2 (2). No law requires the Department to hold a hearing when it considers an application to participate in the Adopt-A-Highway program.

[9] In this regard, the Department argued that the only "speech" implicated by its denial of the application was the sign that the Department erects to recognize a participant in the Adopt-A-Highway program, and such a sign is government speech, not the speech of participants in the program. In the alternative, the Department argued that the Adopt-A-Highway program is a nonpublic forum, and its decision to deny the application was

6

the other hand, argued in their motion that the denial was an abridgement of the freedom of speech predicated on impermissible viewpoint discrimination.[10]

Following a hearing, the trial court denied the Department's motion for summary judgment, and it granted in part the International Keystone Knights' motion. In its November 25, 2014 order, the trial court rejected the argument that the doctrine of sovereign immunity barred the claims for injunctive and declaratory relief, reasoning that the doctrine is no bar to claims premised on an alleged constitutional wrong.[11] Turning to the merits of the case, the trial court found that the Adopt-A-Highway program does not implicate only government speech,[12] and whether the program is a nonpublic forum or not, the trial court

reasonable and viewpoint neutral.

[10] In their motion, the International Keystone Knights relied on the First Amendment of the United States Constitution, as well as the Georgia Constitution, notwithstanding that their complaint raised a claim only under the Georgia Constitution. See note 6, supra.

[11] The trial court acknowledged our decision in Ga. Dept. of Natural Resources v. Center for a Sustainable Coast, 294 Ga. 593 (755 SE2d 184) (2014), and it correctly noted that Sustainable Coast involved no constitutional claims. Since Sustainable Coast, we have not had occasion to consider the extent to which the doctrine of sovereign immunity bars claims for injunctive or declaratory relief from state action that is alleged to be unconstitutional. Cf. Olvera v. Univ. System of Ga. Bd. of Regents, 298 Ga. 425, 428, n.3 (782 SE2d 436) (2016).

[12] We note that this aspect of the trial court's decision may be inconsistent with Walker v. Texas Div., Sons of Confederate Veterans, ___ U. S. ___ (135 SCt 2239, 192 LE2d 274) (2015), a decision about the First Amendment of the United States Constitution,

7

found that the evidence shows that the denial of the International Keystone Knights' application amounted to impermissible viewpoint discrimination. In that respect, the trial court explained that their application was "singled-out for scrutiny not given to other applicants to the program." Accordingly, the trial court concluded that the second ground for the denial was an abridgement of the freedom of speech in violation of the Georgia Constitution.[13] The trial court entered a declaratory judgment that "a denial of an application to the [Adopt-A-Highway program] for public concern related to a group's history of civil disturbance represents an unconstitutional infringement on an applicant's right to free speech," and it enjoined the Department from "denying applications to the [program] for public concern related to a group's history of civil disturbance."[14] Ten days later, the Department filed a notice of appeal.[15]

---

which came down while this case was pending on appeal. Because we are without jurisdiction in this case, however, we have no occasion to decide whether the principles set forth in <u>Walker</u> apply equally to the Georgia Constitution and, if so, whether the decision of the trial court actually is inconsistent with <u>Walker</u>.

[13] The trial court limited its analysis to the Georgia Constitution, see note 10, supra, correctly noting, however, that Georgia courts frequently look to decisional law construing and applying the First Amendment of the United States Constitution when addressing the freedom of speech guaranteed by the Georgia Constitution.

[14] The trial court did not decide whether the first ground for the denial was proper, but it acknowledged that the conditions and requirements that the Department has promulgated

8

2. Although no party to this appeal disputes our jurisdiction, "it is the duty of this Court to inquire into its jurisdiction in any case in which there may be a doubt about the existence of such jurisdiction." Sanders v. State, 280 Ga. 780, 782 (1) (631 SE2d 344) (2006) (citation omitted). See also Williford v. Brown, ___ Ga. ___, ___ (2) (Case No. S16A0177, decided May 9, 2016); Lay v. State, 289 Ga. 210, 211 (2) (710 SE2d 141) (2011). There are two reasons to doubt our jurisdiction in this case. First, there is a question about whether the judgment from which the Department appeals is appealable at all. If it is, there also is a

_____

for participation in the program include a provision that "[l]imited access roads and roads with speed limits of 55 mph and higher are unsafe for volunteer litter pick up and are not eligible for adoption." We note as well that the trial court did not actually order the Department to approve the application of the International Keystone Knights. To the contrary, the trial court only directed that the Department may not deny an application on the second ground at issue.

[15] The notice of appeal was directed to the Court of Appeals. Following briefing and oral argument, the Court of Appeals transferred the case to us in November 2015, explaining that it involves constitutional questions that are within the exclusive appellate jurisdiction of this Court. We agree that this Court has jurisdiction of the subject matter of this appeal. See Ga. Const. of 1983, Art. VI, Sec. VI, Par. II (1) ("The Supreme Court shall be a court of review and shall exercise exclusive appellate jurisdiction in . . . [a]ll cases involving the construction of . . . the Constitution of the State of Georgia . . . ."). We note that this head of our jurisdiction is unchanged by the recent enactment of House Bill 927, the Appellate Jurisdiction Reform Act of 2016. See Ga. L. 2016, p. ___, § 3-1.

9

question about the procedure by which an appeal may be taken. We will consider each of these questions in turn.[16]

3. In its notice of appeal, the Department said that it was appealing from the order denying its motion for summary judgment on the ground of sovereign immunity, and it cited Board of Regents of the Univ. System of Ga. v. Canas, 295 Ga. App. 505 (672 SE2d 471) (2009), for the proposition that an interlocutory refusal of sovereign immunity is an appealable judgment under the collateral order doctrine. This Court, however, recently overruled Canas, and in doing so, we rejected the idea that a refusal of sovereign immunity is, without more, appealable immediately. See Rivera v. Washington, 298 Ga. 770, 778 (784 SE2d 775) (2016). A mere denial of summary judgment on the ground of sovereign immunity is interlocutory, and it is appealable only if the trial court issues a certificate of immediate review and the appellant thereafter brings its appeal as provided in OCGA § 5-6-34 (b). See OCGA § 9-11-56 (h) ("An order denying summary judgment shall be subject to review by direct appeal in accordance with subsection (b) of Code Section 5-6-34."). See also Rivera, 298

_____

[16] No party to this appeal addressed jurisdiction at length in its principal brief, and so, we directed the parties to file supplemental briefs on appellate jurisdiction.

10

Ga. at 777 ("[A]ppeals of non-final orders on claims of immunity must be pursued through the interlocutory procedures of OCGA § 5-6-34 (b)." (Citation omitted)). Here, the trial court issued no certificate of immediate review, and the Department failed to bring its appeal by way of the procedure set forth in OCGA § 5-6-34 (b).

The judgment from which the Department appeals, however, is not just a denial of its motion for summary judgment. In a single order, the trial court denied summary judgment to the Department, granted partial summary judgment to the International Keystone Knights and entered an injunction against the Department. A grant of summary judgment — even a partial grant — is an appealable judgment. See OCGA § 9-11-56 (h) ("An order granting summary judgment on any issue or as to any party shall be subject to review by appeal."). An injunction is immediately appealable as well. See OCGA § 5-6-34 (a) (4) (authorizing appeals from "judgments or orders granting or refusing applications for . . . interlocutory or final injunctions"). For these reasons, the judgment from which the Department appeals is an appealable one, notwithstanding our recent overruling of Canas and its progeny. We now turn, therefore, to the second jurisdictional question.

4. To invoke the jurisdiction of an appellate court, an appellant must bring its appeal in a way that comports with the requirements of the Appellate Practice Act of 1965 as amended.[17] See Wood v. Atkinson, 229 Ga. 179, 180 (190 SE2d 46) (1972) ("[T]he General Assembly enacted the Appellate Practice Act of 1965[,] which prescribes the conditions as to the right of a party litigant to have his case reviewed. We view these prescribed conditions as jurisdictional." (Punctuation omitted)). See also Christopher J. McFadden et al., Georgia Appellate Practice § 12:6 (2015 ed.) ("An appellant who selects the wrong procedure has usually made a fatal error that deprives the appellate court of jurisdiction and requires dismissal." (Citations omitted)); Rebich v. Miles, 264 Ga. 467, 468 (448 SE2d 192) (1994); C & S Nat. Bank v. Rayle, 246 Ga. 727, 730 (273 SE2d 139) (1980). If the appellant is entitled to take an appeal of right, the Appellate Practice Act permits the appellant to do so by filing a notice of appeal in the trial court. See OCGA § 5-6-37. But in some kinds of cases, there are no appeals of right, and any appeal must come instead by way of an application for discretionary review. See OCGA § 5-6-35 (a).

---

[17] See OCGA § 5-6-30 et seq.

12

Of concern in this case, the Appellate Practice Act requires an application to appeal from:

> decisions of the superior courts reviewing decisions of the State Board of Workers' Compensation, the State Board of Education, auditors, state and local administrative agencies, and lower courts by certiorari or de novo proceedings; provided, however, that this provision shall not apply to decisions of the Public Service Commission and probate courts and to cases involving ad valorem taxes and condemnations.

OCGA § 5-6-35 (a) (1). Enacted in 1979,[18] OCGA § 5-6-35 (a) (1) was meant to "reduce the massive caseload of Georgia's appellate courts."[19] Ferguson v. Composite State Bd. of Med. Examiners, 275 Ga. 255, 256 (1) (564 SE2d 715) (2002). See also Rayle, 246 Ga. at 729-730. Appeals in cases to which OCGA § 5-6-35 (a) (1) applies must come by timely application, and if they come instead by a notice of appeal, the appellate court is without jurisdiction and must dismiss the appeal. See Rebich, 264 Ga. at 468. Here, the Department filed no

---

[18] As originally enacted in 1979, the statute did not extend to decisions of the State Board of Education, see Ga. L. 1979, p. 619, § 3, which were added five years later. See Ga. L. 1984, p. 599, § 2.

[19] Although OCGA § 5-6-35 (a) undoubtedly has helped with the "massive caseload of Georgia's appellate courts," this Court and our Court of Appeals both continue to manage very heavy caseloads. See Report of the Appellate Jurisdiction Review Commission at 6-7 & n.22 (Jan. 2016) (available at https://gov.georgia.gov/, visited May 22, 2016).

application to appeal. We must decide, therefore, whether this appeal is from "[a] decision[] of the superior court[] reviewing [a] decision[] of . . . [a] state . . . administrative agenc[y]." If it is, the Department failed to bring its appeal as required by the Appellate Practice Act, and we are left without jurisdiction.

(a) We first consider whether the denial of the International Keystone Knights' application was a "decision" of a "state administrative agency." No one disputes that the Department is a "state administrative agency" for the purposes of OCGA § 5-6-35 (a) (1), and in the context of this case, it quite clearly is.[20]

---

[20] The Appellate Practice Act does not define "state administrative agency" expressly, and the parties have pointed us to no judicial precedents that address the meaning of the term as it is used in OCGA § 5-6-35 (a) (1). Cf. Ga. Dept. of Transp. v. Peach Hill Properties, 278 Ga. 198, 200 (1) (599 SE2d 167) (2004) (holding that OCGA § 5-6-35 (a) (1) did not apply in case involving the Department, but on grounds other than that the Department is not a "state administrative agency"). In these circumstances, the settled principles that inform our consideration of statutory meaning direct us to look to the usual and customary meaning of the term. See Hendry v. Hendry, 292 Ga. 1, 2-3 (1) (734 SE2d 46) (2012). See also Deal v. Coleman, 294 Ga. 170, 172-173 (1) (a) (751 SE2d 337) (2013) (courts must "read the statutory text in its most natural and reasonable way" (citation omitted)). In common legal usage, "administrative agency" refers to "[a] governmental body charged with administering and implementing particular legislation." Black's Law Dictionary at 42 (5th ed. 1979). The Department is a department of the Executive Branch, it is charged by statute with the maintenance of the state highway system, see OCGA § 32-2-2 (a) (1), and pursuant to that statutory mandate, it established the Adopt-A-Highway program, established conditions and requirements for participation in the program, and administers the program, including by determining the eligibility of applicants to participate. When the Department exercises its authority under the statute to administer that program — as it did when it denied the International Keystone Knights' application — it is a "state administrative agency" for the purposes of OCGA § 5-6-35 (a) (1).

14

Even so, the Department argues, its denial of an Adopt-A-Highway application is not a "decision." The Department urges that, as the term is used in OCGA § 5-6-35 (a) (1) with reference to administrative agencies, a "decision" refers to a determination of an adjudicative nature that is made by way of a formal adjudicative procedure. And the Department correctly notes that no law — neither the Administrative Procedure Act, the State Highway Code, nor the Rules and Regulations of the Department — sets forth formal procedures that apply to the consideration and denial of applications to participate in the Adopt-A-Highway program. We agree that a "decision" is a determination of an adjudicative nature, but precedents of this Court — both old and recent — foreclose the idea that a "decision" always must be characterized by formal adjudicative procedures. Ultimately, we conclude that the denial of the International Keystone Knights' application was a determination of an adjudicative nature, and the denial was, therefore, a "decision" of the Department.

The Appellate Practice Act does not define "decision" explicitly, and although some of the judicial precedents hint at the meaning of the term, we have not previously attempted to supply a terse definition. Our analysis begins,

15

therefore, with the usual and settled principles that inform our consideration of statutory meaning:

> A statute draws its meaning, of course, from its text. When we read the statutory text, we must presume that the General Assembly meant what it said and said what it meant, and so, we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would. The common and customary usages of the words are important, but so is their context. For context, we may look to the other provisions of the same statute, the structure and history of the whole statute, and the other law — constitutional, statutory, and common law alike — that forms the legal background of the statutory provision in question.

Tibbles v. Teachers Retirement System of Ga., 297 Ga. 557, 558 (1) (775 SE2d 527) (2015) (citations and punctuation omitted).

In this case, it is useful at the outset to consider the legal distinctions that American courts commonly draw between administrative determinations of different sorts, which form an important part of the legal background of OCGA § 5-6-35 (a) (1) as it applies to the "decisions" of administrative agencies. Administrative agencies usually are a part of the Executive Branch,[21] and so,

---

[21] See, e.g., B&B Hardware, Inc. v. Hargis Indus., ___ U. S. ___, ___ (135 SCt 1293, 191 LE2d 222) (2015) (Thomas, J., dissenting) ("[F]ederal administrative agencies are part of the Executive Branch . . . ."); City of Arlington v. Federal Communications Comm., ___ U. S. ___, ___ (133 SCt 1863, 185 LE2d 941) (2013) (Roberts, C.J., dissenting) ("[M]odern administrative agencies fit most comfortably within the Executive Branch . . . .").

many agency determinations unsurprisingly are quintessentially executive in nature, including, for instance, the day-to-day management of agency personnel and resources, the dissemination of information to the public, the undertaking of law enforcement and compliance investigations, and prosecutorial determinations to initiate or decline to bring enforcement proceedings. But pursuant to their mandates to implement and administer the statutory law, see note 20, supra, administrative agencies also frequently have occasion to make determinations that are not purely executive in nature. See generally Federal Trade Comm. v. Ruberoid Co., 343 U. S. 470, 487 (72 SCt 800, 96 LE 1081) (1952) (Jackson, J., dissenting in part) ("Administrative agencies have been called quasi-legislative, quasi-executive or quasi-judicial, as the occasion required . . . ."). When addressing agency determinations that are not quintessentially executive, the courts routinely have drawn a distinction between determinations that are legislative in nature, on the one hand, and those that are adjudicative in nature, on the other.

Although "the line between legislation and adjudication is not always easy to draw," LC&S, Inc. v. Warren County Area Plan Comm., 244 F3d 601, 603 (7th Cir. 2001), there seems to be some agreement about the defining

17

characteristics of these two sorts of administrative determinations. Administrative determinations of a legislative nature are prospective in application, see, e.g., Prentis v. Atlantic Coast Line Co., 211 U. S. 210, 226 (29 SCt 67, 53 LE 150) (1908), general in application, see, e.g., Dibble v. Quinn, 793 F3d 803, 813 (II) (C) (3) (7th Cir. 2015), and often marked by a general factual inquiry that is not specific to the unique character, activities or circumstances of any particular person, see, e.g., Thomas v. City of New York, 143 F3d 31, 36 (II) (A) (1), n.7 (2nd Cir. 1998). Determinations of an adjudicative nature, on the other hand, are immediate in application, see, e.g., Prentis, 211 U. S. at 226, specific in application, Dibble, 793 F3d at 813 (II) (C) (3), and commonly involve an assessment of "facts about the parties and their activities, businesses, and properties," RR Village Assn. v. Denver Sewer Corp., 826 F2d 1197, 1205 (III) (B) (2nd Cir. 1987). Generally speaking, an administrative determination is "[adjudicative] in character if it is particular and immediate, rather than, as in the case of legislative or rule making action, general and future in effect." Philadelphia Co. v. Securities and Exchange Comm., 175 F2d 808, 816 (I) (D.C. Cir. 1948), vacated as moot, 337 U. S. 901 (69 SCt 1047, 93 LE 1715) (1949). See also Gallo v. United States District

18

<u>Court</u>, 349 F3d 1169, 1182 (2) (B) (9th Cir. 2003) (noting principal considerations in characterizing administrative action as legislative or adjudicative); Charles Alan Wright & Charles H. Koch, Jr., 32 Fed. Prac. & Proc. - Judicial Review § 8122 (1st ed. 2016) ("In general, adjudication is the decisionmaking process for applying preexisting standards to individual circumstances. The core facts are predominantly specific or adjudicative facts." (Footnote omitted)). In distinguishing between legislative and adjudicative determinations, there seems to be broad agreement that substance matters far more than form, and the courts need not "capitulate to the label that a government body places on its action." <u>75 Acres, LLC v. Miami-Dade County</u>, 338 F3d 1288, 1296 (IV) (C) (11th Cir. 2003) (citation omitted).

These principles reflect the usual way in which American courts distinguish among administrative determinations of different sorts, and this Court previously has taken note of that approach. Indeed, in a case decided only six months before the enactment of OCGA § 5-6-35 (a) (1), this Court explicitly acknowledged the settled distinction between administrative determinations of a legislative nature and those of an adjudicative nature. See <u>Bentley v. Chastain</u>, 242 Ga. 348, 349-351 (1) (249 SE2d 38) (1978). With this background in mind,

19

we now turn back to the text and more immediate context of OCGA § 5-6-35 (a) (1).

Both the text and immediate context of OCGA § 5-6-35 (a) (1) indicate that a "decision," as it is used with reference to administrative agencies, is a determination of an adjudicative nature. As for the text itself, the usual and common usage of "decision" suggests that the term should be understood in just this way. When laypersons use the term with reference to the activities of the government, they commonly mean "the act of settling or terminating (as a contest or controversy) by giving judgment," Webster's Third New International Dictionary at 585 (1969), "[t]he passing of judgment on an issue under consideration," The American Heritage Dictionary of the English Language at 484 (3d ed. 1992), and "[t]he action of deciding a contest, dispute, etc." 1 The New Shorter Oxford English Dictionary at 608 (1993). Likewise, when lawyers use the term, they generally are understood to mean "[a] determination arrived at after consideration of facts, and, in legal context, law" or "[a] determination of a judicial or quasi judicial nature." Black's Law Dictionary at 366 (5th ed. 1979).

The context in which the term is used in OCGA § 5-6-35 (a) (1) also seems to point to this understanding of "decision." Recall that the statute refers to the "decisions" of not only state and local administrative agencies, but also the State Board of Workers' Compensation, the State Board of Education, auditors, and the lower courts. Of those with whom the statute is concerned, some — including "administrative agencies" — have executive and quasi-legislative functions, but they all have an adjudicative role. The adjudicative function strikes us as the most obvious tie that binds the various institutions and offices with which OCGA § 5-6-35 (a) (1) is concerned. Cf. Hill v. Owens, 292 Ga. 380, 383 (2) (a) (738 SE2d 56) (2013) ("Words, like people, are judged by the company they keep." (Citation and punctuation omitted)).

The judicial precedents likewise are consistent with this understanding. Only a year after OCGA § 5-6-35 (a) (1) was enacted, we said that the statute was meant to "give the appellate courts . . . the discretion not to entertain an appeal where the superior court had reviewed a decision of certain specified lower tribunals (i.e., two tribunals had already adjudicated the case)." Rayle, 246 Ga. at 730. Since then, we have made repeated reference to "two tribunals" having adjudicated — or at least, having had an opportunity to adjudicate — the

21

merits of cases to which OCGA § 5-6-35 (a) (1) applies. See, e.g., <u>Hamryka v. City of Dawsonville</u>, 291 Ga. 124, 126-127 (3) (728 SE2d 197) (2012); <u>Ladzinske</u>, 280 Ga. 264, 265 (626 SE2d 83) (2006); <u>Ferguson</u>, 275 Ga. at 256 (1). More important, the holdings in the published decisions of this Court reflect a distinction between agency determinations of an adjudicative nature and those that are legislative or quintessentially executive in nature. The decisions in which this Court has actually applied OCGA § 5-6-35 (a) (1) to require applications for discretionary review in cases involving administrative agencies almost uniformly appear to have concerned agency determinations of an adjudicative nature.[22] We consistently have refused, on the other hand, to require

---

[22] See, e.g., <u>Selke v. Carson</u>, 295 Ga. 628, 629 (759 SE2d 853) (2014) (administrative denial of appeal to Civil Service Board on the ground that a layoff was not an appealable event); <u>Augusta-Richmond County v. Lee</u>, 277 Ga. 483, 483 (1) (592 SE2d 71) (2001) (administrative denial of application for retail package license); <u>Northwest Social & Civic Club, Inc. v. Franklin</u>, 276 Ga. 859, 860 (583 SE2d 858) (2003) (administrative denial of applications to renew liquor license); <u>Ferguson</u>, 275 Ga. at 258 (3) (administrative denial of petition for reinstatement of medical license); <u>Swafford v. Dade County Bd. of Commrs.</u>, 266 Ga. 646, 647 (1) (469 SE2d 666) (1996) (administrative suspension of chair of Board of Tax Assessors); <u>Recycle & Recover, Inc. v. Ga. Bd. of Natural Resources</u>, 266 Ga. 253, 254 (1) (466 SE2d 197) (1996) (administrative denial of application for major modification of solid-waste treatment facility); <u>Prison Health Svcs., Inc. v. Ga. Dept. of Admin. Svcs.</u>, 265 Ga. 810, 811 (1) (462 SE2d 601) (1995) (administrative protest of contract award); <u>Armstrong v. Miles</u>, 265 Ga. 344, 344 (455 SE2d 587) (1995) (administrative suspension of driver's license); <u>Miller v. Ga. Dept. of Pub. Safety</u>, 265 Ga. 62, 63-64 (453 SE2d 725) (1995) (administrative suspension of driver's license); <u>Olin Corp. v. Collins</u>, 261 Ga. 849, 849 (413 SE2d 193) (1992) (administrative denial of claim for refund of sales taxes); <u>Miles v. Collins</u>,

applications in cases concerning executive determinations[23] and those involving

rulemaking or other determinations of a legislative nature.[24]

Considering the statutory text, its relevant context, the judicial precedents,

and the usual understanding of American courts generally about administrative

determinations of different sorts, we conclude that "decision" — as the term is

used in OCGA § 5-6-35 (a) (1) with reference to administrative agencies — is

most naturally and reasonably understood to refer to an administrative

determination of an adjudicative nature. On the facts of this case, it is difficult

to characterize the denial of the International Keystone Knights' application to

---

259 Ga. 536, 536 (384 SE2d 630) (1989) (administrative assessment of taxes); Schieffelin & Co. v. Strickland, 253 Ga. 385, 387 (320 SE2d 358) (1984) (administrative denial of application to reduce designated wholesalers of distilled spirits and wine); Tri-State Bldg. & Supply, Inc. v. Reid, 251 Ga. 38, 39 (302 SE2d 566) (1983) (administrative issuance of subpoena); Plantation Pipe Line Co. v. Strickland, 249 Ga. 829, 829 (294 SE2d 471) (1982) (administrative assessment of corporate taxes); Wheeler v. Strickland, 248 Ga. 85, 85 (281 SE2d 556) (1981) (administrative assessment of sales taxes).

[23] See, e.g., Danbert v. N. Ga. Land Ventures, 287 Ga. 495, 495 (697 SE2d 204) (2010) (no application required to appeal from denial of writ of mandamus "to compel Towns County to enforce its subdivision regulations"); Mid-Georgia Environmental Mgmt. Group v. Meriwether County, 277 Ga. 670, 671-672 (1) (594 SE2d 344) (2004) (no application required to appeal from denial of writ of mandamus to compel county to send verification letter to state regulators under OCGA § 12-8-24 (g)).

[24] See, e.g., Ga. Dept. of Transp. v. Peach Hill Properties, 278 Ga. 198, 200 (1) (599 SE2d 167) (2004) (no application required to appeal in case challenging agency policy statement).

participate in the Adopt-A-Highway program as anything but adjudicative in nature. The denial was not a rule or statement of policy that was general and prospective in application. To the contrary, the denial was a determination to reject a single application submitted by a specific applicant, and it had the immediate and particular consequence of disallowing that applicant to participate in the Adopt-A-Highway program upon the terms proposed in the application. Moreover, the denial was not based on general considerations alone, but rather was predicated in part upon an assessment of the suitability of a particular stretch of road for adoption under preexisting standards. The denial was premised as well upon a consideration of the peculiar character of the applicant, particularly the violent and subversive history that comes so readily to mind when one thinks of the Ku Klux Klan and its affiliates. The denial of the International Keystone Knights' application was a determination of an adjudicative nature.

Although a determination of an adjudicative nature is essential to an administrative "decision" for the purposes of OCGA § 5-6-35 (a) (1), the Department says that a "decision" also must be marked by formal adjudicative procedures. We disagree. In the first place, we do not understand the usual and

24

common usage of "decision" to connote any particular degree of formality in the decisional process. Nor is any particular degree of formality inherent in the notion of adjudicative decisionmaking. As preeminent commentators have noted,

> Anglo-American legal institutions tend to make [adjudicative] decisions through an adversary process, usually a trial, and hence lawyers tend to think of adjudication as synonymous with trial processes. Adjudication, however, is any decision which focuses on the resolution of individual controversy and these decisions may be made through any number of different processes.

Wright & Koch, supra, at § 8122. More important, our own precedents foreclose the idea that formal adjudicative procedures are essential to a "decision," as that term is used in OCGA § 5-6-35 (a) (1).

Soon after the enactment of OCGA § 5-6-35 (a) (1), this Court invoked the statute to require an application to appeal in a case involving an administrative determination of an adjudicative nature without any indication that the decisional process at the agency implicated formal adjudicative procedures. In <u>Tri-State Bldg. & Supply, Inc. v. Reid</u>, 251 Ga. 38 (302 SE2d 566) (1983), we considered an appeal from a decision of a superior court on a motion to quash an administrative subpoena issued by the administrator of the

Office of Consumer Affairs. Although the statutory law identified the circumstances in which the administrator was authorized to issue a subpoena, the required content of the subpoena, and the judicial proceedings by which the subject of the subpoena could challenge it, see former OCGA § 10-1-403, there was no statutory law concerning the "process" by which the administrator was to decide whether to issue the subpoena in the first instance, much less any sort of adversarial or other formal adjudicative procedure. Even so, we held that the decision to issue the subpoena was a "decision" of a state administrative agency for the purposes of OCGA § 5-6-35 (a) (1), requiring the appeal to be brought by an application for discretionary review. See 251 Ga. at 39.

More recently, in Selke v. Carson, 295 Ga. 628 (759 SE2d 853) (2014), we considered an appeal from a decision of a superior court reviewing a decision of a county personnel services director, who refused to submit administrative appeals of layoffs to the county civil service board, reasoning that a layoff was not an appealable event. Although the applicable law made certain provision for formal adjudicative proceedings before the *board*, there appear to have been no adversarial or other formal adjudicative procedures that applied to the process by which the *director* decided whether to submit a matter to the

26

board in the first instance. Notwithstanding the absence of any such formal procedures, we held that the director "made an administrative department decision [when he] refus[ed] to forward appellants' [administrative] appeals to the [board]," and for that reason, OCGA § 5-6-35 (a) (1) required an application to appeal from the judgment of the superior court. See 295 Ga. at 629.

Tri-State and Selke are inconsistent with the notion that formal adjudicative procedures are essential to a "decision," and the Department has given us no reason to believe that those cases were wrongly decided. The Department does point, of course, to a number of cases involving "decisions" of administrative agencies that implicated formal adjudicative procedures, but it is unsurprising that many of the published decisions addressing OCGA § 5-6-35 (a) (1) would involve such formal procedures. After all, the greater the stakes in an administrative determination, the greater the likelihood that one aggrieved by that determination will seek judicial review and perhaps will pursue the matter as far as an appellate court, implicating OCGA § 5-6-35 (a) (1). But generally speaking, the greater the stakes, the more likely it is that the statutory law or due process will require formal adjudicative procedures, at least to the extent that the determination implicates liberty or property interests. See

27

generally Gregory v. Sexual Offender Registration Review Board, 298 Ga. 675, 686-687 (3) (784 SE2d 392) (2016) (weight of "the private interest affected" is one of three factors to be considered in assessing what process constitutionally is due). It is, therefore, altogether unremarkable that many of our cases applying OCGA § 5-6-35 (a) (1) involve formal adjudicative procedures, and as Tri-State and Selke illustrate, such procedures are not essential to a "decision" for the purposes of the statute.

That is not to say, however, that formal adjudicative procedures are altogether irrelevant. For OCGA § 5-6-35 (a) (1) to apply with respect to administrative agencies, there must be not only a "decision," but it must be the "decision[] *of* . . . [the] state [or] local administrative agenc[y]." (Emphasis supplied). When the statutory law or a formal regulation requires that the adjudicative process follow formal adjudicative procedures, those procedures commonly identify the point of decision for the agency, as well as the officer with legal authority to make the determination for the agency. See, e.g., OCGA § 50-13-41 (Administrative Procedure Act procedures for hearing before administrative law judge). In those instances, the task of identifying the point at which the agency itself has made a determination is relatively straightforward.

28

In the absence of formal adjudicative procedures, however, it may be less apparent in some cases who is authorized to speak for the agency and whether the agency itself has really made any decision at all. Determinations by persons not legally authorized to bind an agency, after all, cannot be fairly characterized as decisions *of* the agency. A couple of the Georgia precedents have recognized this problem. See Ford Motor Co. v. Collins, 257 Ga. 310, 310 (1) (357 SE2d 567) (1987) ("We decline to hold that a letter from an official within the office of the Commissioner of the Department of Revenue is an agency 'decision' within the meaning of [OCGA § 5-6-35 (a) (1)]."); Fulton County v. T-Mobile South, LLC, 305 Ga. App. 466, 468-469 (1) (699 SE2d 802) (2010) (letter from county attorney was not a "decision" of an administrative agency).

Here, however, we do not confront such a problem. The record shows that the Department denied the application at issue by way of a letter from the Commissioner himself. Whatever ambiguity might exist about who else at the Department is authorized to speak definitively for the agency on the question of an Adopt-A-Highway application, it cannot seriously be disputed that the Commissioner — the chief executive officer of the Department, see OCGA § 32-2-40 (a) — is authorized to do so. For these reasons, we conclude that this

case involves a "decision" of a state administrative agency for the purposes of OCGA § 5-6-35 (a) (1).

(b) The Department contends that, even if its denial of the International Keystone Knights' application was an administrative "decision," the judgment of the superior court from which the Department appeals was not a "decision[] of the superior court[] reviewing" the denial of the application. To this end, the Department points out that the judgment from which it appeals was not entered in a proceeding under the Administrative Procedure Act[25] or any other statute authorizing direct judicial review of its denial of the International Keystone Knights' application. Instead, the Department notes, the judgment was entered in a proceeding for injunctive and declaratory relief. That is true enough, but when we consider the nature of the proceedings in the superior court for the purposes of OCGA § 5-6-35 (a) (1), we look to the substance of those proceedings, not merely the form of the relief sought. See Ladzinske v. Allen, 280 Ga. at 265. See also Rebich, 264 Ga. at 468. We previously have applied OCGA § 5-6-35 (a) (1), of course, in appeals from proceedings for judicial

_____

[25] Indeed, the Department now contends that this case is not subject to the Administrative Procedure Act, although it argued otherwise in the trial court. See note 8, supra, and accompanying text.

review under the Administrative Procedure Act and other statutes. See, e.g.,

Schieffelin & Co. v. Strickland, 253 Ga. 385, 387 (320 SE2d 358) (1984)

(judicial review under Administrative Procedure Act); Plantation Pipe Line Co.

v. Strickland, 249 Ga. 829, 829 (294 SE2d 471) (1982) (judicial review under

Revenue Code). But we also have applied it in appeals from judgments entered

upon petitions for writs of mandamus, see, e.g., Rebich, 264 Ga. at 468,

petitions for injunctive relief, see, e.g., Prison Health Svcs., Inc. v. Ga. Dept. of

Admin. Svcs., 265 Ga. 810, 811 (1) (462 SE2d 601) (1995), and complaints for

declaratory relief. See, e.g., Dunlap v. City of Atlanta, 272 Ga. 523, 524 (531

SE2d 702) (2000). The form of the proceedings below is not dispositive.

Here, the subject matter of the proceedings and judgment from which the

Department appeals is the denial of the Adopt-A-Highway application. In their

complaint, the International Keystone Knights directed most of their allegations

to the filing, consideration, and eventual denial of their application, and they

sought relief specifically to compel the Department to grant their application. On

the motions for summary judgment, both parties put forward evidence about the

denial of that application. And in its order denying summary judgment to the

Department, awarding partial summary judgment to the International Keystone

31

Knights, and entering an injunction and declaratory judgment, the trial court specifically addressed the grounds upon which the Department denied that application and found, among other things, that the second ground amounted to impermissible viewpoint discrimination because the International Keystone Knights were "singled-out for scrutiny not given to other applicants in the program."

If a party to a judicial proceeding "attacks or defends the validity of an administrative ruling and seeks to prevent or promote the enforcement thereof, the trial court must necessarily 'review' the administrative decision [to resolve the merits of the case]." Ferguson, 275 Ga. at 257-258 (2) (citations and punctuation omitted). Notwithstanding that the proceedings and judgment below were only for injunctive and declaratory relief, the proceedings and judgment amounted to a review of a decision to deny a particular Adopt-A-Highway application. See Ladzinske, 280 Ga. at 265.

5. Because the Department appeals from a decision of a superior court reviewing a decision of a state administrative agency, it was required under OCGA § 5-6-35 (a) (1) to bring its appeal by way of an application for discretionary review. The Department failed to do so, and that circumstance

32

leaves this Court without appellate jurisdiction. Accordingly, this appeal must be dismissed.

Appeal dismissed. All the Justices concur.